IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN STROUD               :
                               :          CIVIL ACTION
     v.                    :
                               :          NO. 10-3355
RYAN BOORSTEIN, ET AL.      :

**SURRICK, J.**                                           **MAY  19 , 2014**

<u>**MEMORANDUM**</u>

      Presently before the Court is Defendants' Motion for Partial Summary Judgment.  (ECF
No. 38.)  For the following reasons, the Motion will be granted in part, and denied in part.

**I.      BACKGROUND**

      Plaintiff Steven Stroud brings this action under 42 U.S.C. § 1983, and Pennsylvania law,
against four City of Easton police officers as a result of injuries he sustained during a traffic stop
that occurred on July 18, 2009.  Defendants are Police Officers Ryan Boorstein, Andrew
Ocetnik, and Daniel Bonham, and Sergeant Brian Herncane.

      **A.     Factual Background[1]**

      At approximately 3:00 a.m. on July 18, 2009, Officers Boorstein and Ocetnik observed a
red vehicle with its rear window covered by a black plastic bag obstructing the driver's rear view
of the roadway.  (Boorstein Dep. 42, Defs.' Mot. Ex. A, ECF No. 38; Police Rept., Defs.' Mot.
Ex. B; Crim. Compl. 3, Defs.' Mot. Ex. I.)  The license plate light on the vehicle was also not
working.  (Boorstein Dep. 42.)  The vehicle was being driven by Plaintiff, who was returning
home from a dance club, Club Beyond, located in Easton, Pennsylvania.  (Stroud Dep. 64, Pl.'s
Resp. Ex. A, ECF No. 41.)  Plaintiff was at the dance club from approximately 11 p.m. until

---

[1] Plaintiff's Response to Defendants' Summary Judgment Motion contains no factual
allegations, and instead, merely attaches a copy of Plaintiff's deposition transcript.

approximately 2:00 a.m.  (*Id.* at 65-66.)

As Plaintiff parked his car in front of his home on Rock Street, the officers pulled behind him and activated their emergency overhead lights.  (*Id.* at 77.)[2]  Plaintiff attempted to get out of the vehicle.  (Stroud Dep. 78)  Officer Ocetnik told him to get back in the car, and Plaintiff complied.  (*Id.*)  Officers Boorstein and Ocetnik stated that Plaintiff began yelling at them and continued to yell at them while the officers explained to him the reason for the traffic stop.  (Police Rept. 5.)[3]  The officers then asked Plaintiff to get out of the car, and advised him that he was being pulled over because of the plastic bag on his rear window and the non-functioning license plate light.  (Stroud Dep. 78-79.)

Officer Ocetnik described Plaintiff's demeanor at this point as "very irate," explaining that "[t]here was a lot of yelling [and] swearing" at the officers.  (Nov. 10, 2009 Trial Tr. 34, Defs.' Mot. Ex. F.)  Officer Boorstein observed that Plaintiff's breath smelled of alcohol, that he was acting nervous, and that he had slurred speech and glassy, bloodshot eyes.  (Boorstein Dep. 51; Police Rept. 5.)  Similarly, Officer Ocetnik noticed that Plaintiff "seemed impaired," smelled of alcohol, had slurred speech, and had red, glassy eyes.  (Nov. 10 Trial Tr. 37.)  When asked by the officers where he had been that evening, Plaintiff first responded that he had been at his girlfriend's house.  He later confessed that he had been at a dance club.  (Boorstein Dep. 51; Police Rept. 5.)  Officer Bonham, who did not arrive to the scene until later, also testified that Defendant seemed impaired, that he smelled of alcohol, and that he had slurred speech and red,

---

[2] Officer Boorstein stated in the police report that he activated the overhead lights before approaching Plaintiff's home, while all cars were driving south on St. John's Street, and that Plaintiff failed to immediately respond.  (Police Rept. 5.)  After the lights were activated, Plaintiff turned left on Rock Street and finally pulled to the side of the road.  (*Id.*)

[3] Plaintiff was yelling, "Why don't you leave me alone and let me go home," and "Why am I being stopped."  (Police Rept. 5.)

glassy eyes.  (Nov. 10 Trial Tr. 37.)[4]

Officer Ocetnik told Plaintiff that he smelled alcohol, to which Plaintiff replied, "you don't smell alcohol on me because I wasn't drinking."  (Stroud Dep. 82.)  Suspecting that Plaintiff was under the influence of alcohol or drugs, the police officers requested that Plaintiff submit to field sobriety tests and Plaintiff agreed.  (*Id*. at 82-83; Boorstein Dep. 52; Police Rept. 5.)  The first field sobriety test was the one-legged-stand, which requires an individual to stand with one leg off of the ground for 30 seconds.  (Stroud Dep. 83; Boorstein Dep. 54; Police Rept. 5; Defs.' Mot. 3 n.2.)  Officer Boorstein first demonstrated the test for Plaintiff.  (Stroud Dep. 83; Boorstein Dep. 54-55.)  Plaintiff claims that during the demonstration, Officer Boorstein lost his balance on count 24.  (Stroud Dep. 83.)[5]  When Plaintiff performed the one-legged-stand test, he "mimicked" Officer Boorstein by purposely losing his balance at count 24.  (Stroud Dep. 86.)  Plaintiff never told the officers that he was "joking around."  (*Id*. at 84.)  Officer Boorstein characterized Plaintiff's performance differently, stating that he "showed signs of impairment" by touching his foot down several times, and extending his hands out to his side for balance.  (Boorstein Dep. 55-56; *see also* Police Rept. 5 (indicating that Plaintiff did not raise his foot at least six inches off the ground, placed his left foot on the ground six times, and was "swaying his arms for balance").)  Officer Boorstein's recollection of Plaintiff's performance was corroborated by Officer Ocetnik, who indicated that Plaintiff "was unable to remain standing on one foot," put his foot on the ground several times and was unable to reach the count of 30.

---

[4] At his criminal trial, Plaintiff testified that his speech was not slurred that evening, but acknowledged that he has "holes in his teeth" and therefore often spits when he talks.  (Aug. 4, 2010 Trial Tr. 67, 70, Defs.' Mot. Ex. C.)  He also testified that his eyes may have been bloodshot since he was tired, (Stroud Trial Tr. 70), and that he may have smelled like alcohol since a man at the club threw beer on him (*id*. at 104).

[5] Officer Boorstein disputes Plaintiff's allegation that he lost balance, and states that he only counted to five when demonstrating the test to Plaintiff.  (Boorstein Dep. 55.)

3

(Police Rept. 7.)  Officer Boorstein advised Plaintiff that he had failed the one-legged-stand test.

(Stroud Dep. 86.)

Plaintiff also failed the walk-and-turn test because he did not walk heel to toe, he used his

hands for balance, and he failed to walk backwards.  (Boorstein Dep. 58; Police Rept. 5.)  The

officers also attempted to administer the horizontal-gaze-nystagmus test, but they could not

complete the test because Plaintiff failed to cooperate.  (Boorstein Dep. 59; Police Rept. 5, 7.)[6]

The officers asked Plaintiff if he would submit to a Portable Breathalyzer Test ("PBT").

(Ocetnik Dep. 34-35, Defs.' Mot. Ex. F; Police Rept. 5.)  Plaintiff states that he agreed to take

the PBT, and walked towards his car to sit down to wait for Officer Bonham to arrive with the

PBT.  (Stroud Dep. 88-89.)[7]

The parties dispute what occurred next.  Plaintiff alleges that as he was walking towards

his car, Officer Ocetnik approached him and punched him in the face.  (Stroud Dep. 88-89.)

Officer Boorstein then jumped on Plaintiff.  (*Id*. at 89.)  Plaintiff states that he screamed for help

as he was being "attacked" by the officers.  (*Id*.)  Plaintiff heard one of the officers yell "Taser"

and then, the next thing he knew, he felt paralyzed and fell to the ground.  (*Id*. at 91-92.)  While

on the ground, Officer Ocetnik was "kicking the mess out of" Plaintiff, kicking him in the face,

head, ribs, and shoulder.  (*Id*. at 92, 94-95, 100.)  At the same time, Officer Boorstein was

punching Plaintiff in the face.  (*Id*. at 97.)  Officer Ocetnik was kicking Plaintiff for "a good five

to ten minutes, while exclaiming, "he's resisting, he's resisting."  (*Id*. at 94.)  Plaintiff states that

---

[6] Officer Boorstein stated that he always administers the three field sobriety tests
approved by the National Highway Traffic Safety Administration:  the one-legged-stand test, the
walk-and-turn test, and the horizontal-gaze-nystagmus test.  (Boorstein Dep. 58.)

[7] Defendants contend that Plaintiff refused to take the PBT, yelled at the officers, and
continued to make "a disturbance in the street."  (Police Rept. 5; *see also* Ocetnik Dep. 35.)

he was paralyzed by the Taser and could not resist.  (*Id*. at 95.)[8]

    While on the ground, Plaintiff heard a car door slam and saw Officer Bonham approach. (Stroud Dep. 95-96.)[9]  Bonham struck Plaintiff in the shoulder.  (Stroud Dep. 96; *see also* Bonham Dep. 33.)[10]  Bonham stated to the other officers, "Taser him again."  (Stroud Dep. 96.) Plaintiff was then Tasered for the second time in his left butt cheek.  (*Id*.)  Plaintiff again felt paralyzed from the Taser.  (*Id*.)  Officer Ocetnik struck Plaintiff two to three times with a flashlight.  (*Id*. at 101.)  Officer Ocetnik removed $350 from Plaintiff's wallet, and threw the wallet back into Plaintiff's vehicle.  (*Id*. 52-54; 113.)

    Plaintiff was picked up off of the ground and walked to the police vehicle.  (*Id*. at 102.) His arm scrapped on the ground as he was lifted, causing his arm to bleed.  (*Id*.)  Plaintiff's head

---

    [8] The description of the incident from Officer Boorstein and Officer Ocetnik differs from Plaintiff's description.  Officer Boorstein states that after Plaintiff failed the field sobriety tests and refused to take a PBT, he was advised that he was under arrest for suspicion of driving under the influence ("DUI").  (Boorstein Dep. 60.)  Plaintiff began to walk away when Officer Ocetnik grabbed his arm.  (*Id*.)  Plaintiff then "swung around and punched Officer Ocetnik in the side of the head."  (*Id*.)  Officer Boorstein approached to grab Plaintiff's other arm to take him into custody when Plaintiff kicked Officer Boorstein.  (*Id*. at 67.)  Officer Boorstein took out his Taser gun and advised Plaintiff that if he continued to resist, he would be Tasered.  (*Id*.)  Plaintiff did not comply.  (*Id*.)  Officer Boorstein stated "Taser up" to alert the other officers, and deployed the Taser on Plaintiff's low back, but the Taser had no effect on Plaintiff since it hit his belt and baggy shirt.  (*Id*. at 67-68.)  Plaintiff was brought to the ground and continued to kick the officers and resist arrest.  (*Id*. at 70, 74.)  Officer Ocetnik offered similar testimony, stating that Plaintiff punched him several times during the incident and that they both fell to the ground, "wrestling."  (Nov. 10 Trial Tr. 34-37; *see also* Police Rept. 7-8.)

    [9] Officer Bonham testified that when he arrived to the scene, he witnessed Plaintiff backing away from the officers, and then saw that Officer Ocetnik and Plaintiff were "in a struggle."  (Police Rept. 8; *see also* Bonham Dep. 20-21, Defs.' Mot. Ex. E.)  Bonham stated that, in order to restrain Plaintiff—who was "yelling and screaming" and "kicking his legs and trying to kick and punch at" the officers—he grabbed Plaintiff's right arm to put it behind his back."  (Bonham Dep. 32.)  According to Bonham, Plaintiff punched him in the back.  (*Id*. at 33.)

    [10] Bonham stated that he delivered two strikes with the palm of his hand to Plaintiff's right upper shoulder, which allowed him to gain control of Plaintiff's arm and handcuff him. (Bonham Dep. 33; Police Rept. 8.)

was also "a little bloody." (*Id*. at 105.)  Sergeant Herncane arrived to the scene at this time, and "slammed the door" of the police cruiser when Plaintiff was sitting inside of it. (*Id*. at 103.) Officer Boorstein escorted Plaintiff to the police station. (*Id*. at 106.)  In route to the police station, Plaintiff asked Officer Boorstein if he could go to the hospital. (*Id*. at 109.)  Officer Boorstein responded that Plaintiff could speak to Sergeant Herncane about it. (*Id*. at 110.) During intake procedures at the station, Plaintiff requested medical treatment "numerous times." (*Id*. at 109-10.)  Plaintiff later testified that "everything was hurting," including his head and arm. (*Id*. at 127.)  Photographs of Plaintiff were taken at the police station. (*Id*. at 128-129; Defs.' Mot. Ex. L.)

From the police station, Plaintiff was taken to Northampton County DUI Center, where his blood was drawn. (Stroud Dep. 115-117; Boorstein Dep. 74; DUI Rept., Defs.' Mot. Ex. H.) At the DUI Center, a DUI officer completed a report indicating that Plaintiff had a "slight" odor of alcohol, "bloodshot/red eyes," and "glassy eyes." (DUI Rept.)  Plaintiff was transported back to the police station and ultimately to the Northampton County prison. (Stroud Dep. 124-25.)  At the prison, Plaintiff had x-rays taken, which revealed that he had no broken bones. (*Id*. at 129-130.)  Plaintiff received pain medication approximately three to four weeks after arriving at the prison. (*Id*.)  After being released from prison, Plaintiff did not seek medical treatment because he could not afford it. (*Id*. at 130.)

On July 18, 2009, a criminal complaint was filed against Plaintiff. (Crim. Compl.) Plaintiff was charged with aggravated assault, simple assault, recklessly endangering another person, driving under the influence of alcohol or controlled substances, resisting arrest, harassment, and summary traffic citations. (*Id*.; *see also* Defs.' Mot. 4.)  The results of the blood tests revealed that Plaintiff had a .01 blood alcohol level. (Defs.' Mot. 4.)  Based on these

results, the Northampton County District Attorney's Office withdrew the DUI charges. (*Id.*;
Sept. 21, 2009 Prelim. Hr'g Tr. 51, Defs.' Mot. Ex. J.) At a preliminary hearing, a Magisterial
District Judge in Northampton County dismissed the aggravated assault and reckless
endangerment charges, but determined that the simple assault and resisting arrest charges should
be held over for trial at the county level. (*Id.*) At the subsequent trial, a jury found Plaintiff not
guilty of all charges. (Am. Compl. ¶ 55, ECF No. 36.) The Judge found Plaintiff guilty of the
summary traffic violations. (Defs.' Mot. 5.)

> **B.    Procedural History**

Plaintiff, acting *pro se*, filed the original Complaint on July 21, 2010. (ECF No. 3.)
Thereafter, counsel was appointed to represent Plaintiff. (*See* ECF No. 13.) On October 19,
2012, counsel filed an Amended Complaint. Defendant asserts the following claims against
Defendant Police Officers: excessive force, unlawful seizure, and deprivation of property
without due process of law under the Fourth Amendment (Count 1); denial of medical care,
deprivation of property without due process, and falsification of criminal documents under the
Fourteenth Amendment (Count 2); assault and battery under state law (Count 3); malicious
prosecution (Count 4); and false arrest (Count 5).[11]

Defendants filed the instant Motion for Partial Summary Judgment (Defs.' Mot., ECF
No. 38), to which Plaintiff filed a Response (Pl.'s Resp., ECF No. 41). Defendants filed a Reply
Brief in further support of their Motion. (Defs.' Reply, ECF No. 42.) The parties also filed
multiple motions *in limine* in preparation for the trial. (*See* ECF Nos. 30-34.) The Court advised
the parties that responses to the motions *in limine* need not be filed until ten days after the Court

---

[11] The claim for deprivation of property without due process of law falls under the
Fourteenth Amendment, not under the Fourth Amendment. We will analyze this claim with
respect to Count 2 and dismiss the claim as it is alleged in Count 1. *See infra* at Section III.D.

rules on Defendants' Motion for Summary Judgment.

## II.   LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . .");  *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The nonmoving party may not avert summary judgment by relying on speculation or by rehashing the allegations in the pleadings.  *Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir. 1999).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita,* 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255.  Moreover, courts must not resolve factual disputes or make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir. 1995).

### III.    DISCUSSION

Defendants seek dismissal of the following claims asserted by Plaintiff:  (1) the false arrest and malicious prosecution claims; (2) the denial of medical care claim; (3) the excessive force and assault and battery claims alleged against Officer Bonham and Sergeant Herncane; (4) the deprivation of property claim alleged against all Defendants, except Officer Ocetnik; and (5) all claims asserted against Sergeant Herncane.  In addition, Defendants contend that the officers are protected by qualified immunity on the denial of medical services and excessive force claims.  Defendants do not seek to dismiss the excessive force claim against Officers Boorstein and Ocetnik, or the deprivation of property claim against Officer Ocetnik.

#### A.    False Arrest Claim against All Defendants

In Count 5 of the Amended Complaint, Plaintiff asserts a false arrest claim against all of the police officers.  Defendants seek dismissal of the claim, arguing that probable cause existed to arrest Plaintiff for DUI.  Defendants also argue that the claim should be dismissed against Sergeant Herncane because he arrived to the scene after all of the events relevant to the arrest occurred.  Finally, Defendants contend that Officer Bonham cannot be liable for false arrest because he had no role in the initial traffic stop nor any of the events leading up to the DUI charges.

"To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012).  To maintain a claim for false arrest, Plaintiff must demonstrate that the officers conducting the arrest lacked probable cause.  *Wright v. City of Phila.*, 409 F.3d 595, 601 (3d Cir. 2005).  Police need probable cause to exist for only one of the offenses that were charged.  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir.

1994). Similarly, under Pennsylvania law, a plaintiff must demonstrate the absence of probable

cause to make out a claim for false arrest. *See Renk v. City of Pittsburgh*, 641 A.2d 289, 295 n.2

(Pa. 1994).

Probable cause to arrest is found "where the facts and circumstances within the arresting

officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an

offense has been or is being committed by the person to be arrested." *United States v. Cruz*, 910

F.2d 1072, 1076 (3d Cir. 1990); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)

("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the

facts known to the arresting officer at the time of the arrest."); *Wright*, 409 F.3d at 602 (noting

that probable cause to arrests exists "if at the moment the arrest was made the facts and

circumstances within the officers' knowledge . . . were sufficient to warrant a prudent man in

believing that the suspect had committed or was committing an offense" (internal quotations and

citations omitted)). Whether or not the arrest was constitutional does not depend on whether the

suspect was ultimately charged with the crime or acquitted of the charges. *Wright*, 409 F.3d at

602. Generally, the existence of probable cause is an issue reserved for the jury, particularly in

cases when the probable cause determination rests on credibility conflicts. *Merkle v. Upper*

*Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). "However, a district court may conclude

'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff,

reasonably would not support a contrary factual finding,' and may enter summary judgment

accordingly." *Id*. at 788-89 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

As long as the police officers had some reasonable basis to believe that Plaintiff was

driving under the influence of alcohol, the arrest was justified as being based on probable cause.

Here, when Officers Boorstein and Ocetnik first encountered Plaintiff, they noticed that he had

10

glassy, bloodshot eyes and was slurring his speech.  They also observed that he smelled like

alcohol.  Plaintiff explained that he had not been drinking, but that someone at the club had

thrown beer on him.  However, this explanation came after Plaintiff lied to the officers by telling

them that he was at his girlfriend's house, and then later confessed that he was really out at a

dance club.  In addition, Plaintiff failed two of the three field sobriety tests and was

uncooperative on the third test.  Based on these facts, we are satisfied that the officers had a

reasonable basis to believe that Plaintiff was under the influence of alcohol when he was pulled

over for an obstructed rear view window and a non-functioning license plate light.  The case law

analyzing the factual premise supporting probable cause to arrest for driving under the influence

of alcohol supports our conclusion.  *See Reyes v. Diluzio*, 495 F. App'x 219, 221-22 (3d Cir.

2012) (finding probable cause existed where the plaintiff failed two field sobriety tests and where

the police officers observed that he had an open container of beer in his car, alcohol on his

breath, and "glassy, bloodshot eyes and sluggish movements"); *Commonwealth v. Klingensmith*,

650 A.2d 444, 458 (Pa. Super. Ct. 1994) (finding probable cause where the appellant had blood

shot eyes, smelled of alcohol, and failed two field sobriety tests); *Commonwealth v. Hamm*, 583

A.2d 1245, 1247 (Pa. Super. Ct. 1990) (finding that probable cause existed where the defendant

was observed driving erratically, had an odor of alcohol on his breath, and failed field sobriety

tests); *Commonwealth v. Smith*, 555 A.2d 185, 189 (Pa. Super. Ct. 1989) (determining that

probable cause existed where the defendant smelled of alcohol, had glassy and bloodshot eyes,

and was the driver in a fatal one-car accident).

   Probable cause existed to arrest Plaintiff for DUI.  Accordingly, summary judgment will

be granted on Plaintiff's false arrest claim in favor of all Defendants.

**B.      Malicious Prosecution Claim against All Defendants**

Plaintiff asserts a malicious prosecution claim against all of the police officers.[12] Defendants seek to dismiss the claim on the basis that the charges brought against Plaintiff were initiated with probable cause.  Defendants also claim that there is no evidence in the record suggesting that the officers' initiation of the traffic stop or subsequent arrest of Plaintiff were done "with malice or for a purpose other than bringing Plaintiff to justice."  (Defs.' Mot. 10.) Plaintiff responds that the officers pulled him over purely because of his race—African American—and that the arrest was therefore made for an improper purpose.  Plaintiff also contends that his mimicking of Officer Boorstein during the one-legged-stand field sobriety test presents a disputed issue of fact as to whether probable cause existed to arrest Plaintiff.

To prove a malicious prosecution claim, a plaintiff must show that:  "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty."  *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007).  Claims for malicious prosecution are generally brought against the prosecutors, and not the police officers involved in the incident. However, a police officer can be liable for malicious prosecution if he or she "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to

---

[12] Plaintiff also appears to allege a Fourteenth Amendment claim in Count 2, stating that his "right to not have the government falsify criminal documents against [him]" was violated. (Am. Compl. ¶ 64.)  The law does not support such a claim, since "the filing of a false police report is not itself a constitutional violation."  *Jarrett v. Twp. of Bensalem*, 312 F. App'x 505, 507 (3d Cir. 2009) (quotations and citations omitted).  To the extent that Plaintiff asserts a constitutional claim that Defendants falsified criminal documents, including the police report and criminal complaint, the claim will be dismissed.

exercise independent judgment in deciding whether to prosecute." *Telepo v. Palmer Twp*., 40 F. Supp. 2d 596, 610 (E.D. Pa. 1999) (internal quotations omitted); *see also Brockington v. City of Phila.*, 354 F. Supp. 2d 563, 569 (E.D. Pa. 2005).

Plaintiff's malicious prosecution claim fails for the same reason that his false arrest claim fails: the police officers had probable cause to arrest Plaintiff for DUI. The Third Circuit has determined that "the existence of probable cause with respect to one offense for which the plaintiff was arrested similarly 'dispose[s] of [his] malicious prosecution claims with respect to all of the charges brought against [him].'" *Johnson*, 477 F.3d at 82 (quoting *Wright*, 409 F.3d at 604). For the same reasons that probable cause existed to arrest Plaintiff, *see supra* Section III.A, probable cause existed to prosecute Plaintiff. Whether or not Plaintiff mimicked Officer Boorstein during one of the field sobriety tests does not change this result. The police officers' probable cause determination was reasonably based upon all of the facts and circumstances that existed at the time of the arrest. The officers observed that Plaintiff had bloodshot, glassy eyes, smelled of alcohol, had slurred speech, failed the walk-and-turn field sobriety test, was uncooperative on the horizontal-gaze-nystagmus test, and initially misrepresented his whereabouts earlier in the evening.

We also reject Plaintiff's baseless allegation that he was arrested and subsequently prosecuted merely because he is African American. There is no evidence in the record to suggest that there was racial animus on the part of any of these police officers. All we have is Plaintiff's bald accusation. Plaintiff has failed to demonstrate that the arrest and prosecution were done with malice or for an improper purpose. Finally, Plaintiff's malicious prosecution claim fails because he has not alleged any facts demonstrating that the police officers "fail[ed] to disclose exculpatory evidence to prosecutors, [made] false or misleading reports to the

prosecutor, omit[ted] material information from the reports, or otherwise interfere[d] with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Telepo*, 40 F. Supp. 2d at 610 (quotation marks omitted).  Summary judgment is therefore appropriate with regard to Plaintiff's malicious prosecution claim.

### C.    Denial of Medical Treatment

Plaintiff asserts a claim for the denial of medical treatment under the Fourteenth Amendment.  Plaintiff claims that he requested to go to the hospital on multiple occasions and that those requests were denied.  Defendants seek dismissal of this claim, arguing that Plaintiff has failed to establish one of the necessary elements of the claim—a serious medical need. Defendants also contend that the claim fails against Officers Bonham and Ocetnik because there is no evidence in the record that these officers specifically denied Plaintiff medical services.

To establish a claim for denial of medical treatment under the Fourteenth Amendment, a plaintiff must show:  (1) a serious medical need; and (2) behavior on the part of the police officers that constitutes deliberate indifference to that need.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).[13]  To satisfy the first element, Plaintiff must show that his medical need was serious.  The Third Circuit has defined a serious medical need as:  (1) "one that has been diagnosed by a physician as requiring treatment"; (2) "one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention"; or (3) one for which the "denial of treatment would result in the

---

[13] The standard set forth in *Estelle* falls under the Eighth Amendment proscription against cruel and unusual punishment.  Since the Eighth Amendment applies only to prisoners, deliberate indifference claims for pretrial detainees and individuals detained during an arrest or investigatory stop are analyzed under the due process clause of the Fourteenth Amendment. Courts will apply the deliberate indifference standards from *Estelle* and other Eighth Amendment cases to claims falling under the Fourteenth Amendment.  *See Brown v. Deparlos*, 492 F. App'x 211, 214-15 (3d Cir. 2012).

unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."

*Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotations and citations

omitted).

 The second element of the *Estelle* standard requires Plaintiff to show "acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429

U.S. at 106.  The Third Circuit has stated that deliberate indifference is "more than an

'inadvertent failure to provide adequate medical care,'" *DeFranco v. Wolfe*, 387 F. App'x 147,

158 (3d Cir. 2010) (quoting *Estelle*, 429 U.S. at 105), and "more than mere negligence or

medical malpractice without some more culpable state of mind," *id*. (quoting *Estelle*, 429 U.S. at

106).  Rather, deliberate indifference "requires 'obduracy and wantonness,'" such as "conduct

that includes recklessness or a conscious disregard of a serious risk." *Id*. (quoting *Rouse v.

Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

 Plaintiff states that after the incident, his arm was bleeding and his head was "a little

bloody." (Stroud Dep. 102, 105.)  Plaintiff further states that he continues to suffer from

headaches, back pain, and shoulder pain.  (*Id*. at 7.)  Notably, absent from the summary judgment

record are any medical records or diagnoses for Plaintiff's injuries.  In mid-2012, more than two

years after the incident, Plaintiff's attorney sent him to see a physician.  (*Id*. at 130-31.)  Also in

2012, Plaintiff went to a medical clinic for a checkup and to have his blood pressure taken.  No

records from these medical visits were submitted to the Court.  Despite Plaintiff's medical

complaints, Plaintiff never sought medical treatment for the injuries he sustained as a result of

this incident, with the exception of one doctor's visit coordinated by his attorney.  In addition,

the x-rays he received when he first arrived at Northampton County prison revealed that he had

no broken bones.

Based on the undisputed facts, we are satisfied that Plaintiff's injuries do not rise to the level of a serious medical need for purposes of establishing the first element of an *Estelle* claim under the Fourteenth Amendment.  There is no evidence that his injuries were diagnosed by a physician as requiring treatment.  *See Atkinson*, 316 F.3d at 272-73.  In addition, Plaintiff's injuries were not so obvious that a lay person would recognize the need for a doctor's attention. *See id*. Finally, there is no evidence that the denial of treatment during the time he was detained by the police resulted in "the unnecessary and wanton infliction of pain" or "a life-long handicap or permanent loss."  *See id*. at 273.  Plaintiff may have experienced mild discomfort as a result of the bruising, bleeding, and head pain, but these symptoms, without others, are not generally recognized as serious medical needs under the *Estelle* framework.  *See Fernandez v. Metro Dade Police Dept*., 397 F. App'x 507, 512 (11th Cir. 2010) (finding that a bloody nose and mouth, facial bruising, pain, and disorientation did not constitute a serious medical need); *Royster v. Beard*, No. 09-1150, 2013 U.S. Dist. LEXIS 127729, at *16-19 (W.D. Pa. Sept. 6, 2013) (holding that loss of consciousness, excessive bruising, bleeding, and swelling did not constituted serious medical needs under a denial of medical care claim); *Brown v. Rodarmel*, No. 10-293, 2013 U.S. Dist. LEXIS 43106, at *32-34 (M.D. Pa. Mar. 27, 2013) (holding that cuts and bruises, minor lacerations, and head and back pain did not constitute a serious medical need under *Estelle*); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (finding that black and blue eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need); *Rodriguez v. Mercado*, No. 00-8588, 2002 U.S. Dist. LEXIS 16057, at *22-25 (S.D.N.Y. Aug. 28, 2002) (finding that bruises to the plaintiff's head, back, and wrists, accompanied by back pain and migraines did not constitute a serious medical need).

In addition, Plaintiff has not offered any medical evidence to substantiate his claim that

his injuries were exacerbated as a result of not being permitted medical treatment while in the custody of the police.   To survive summary judgment, a plaintiff alleging a constitutional deprivation of his right to adequate medical care must submit medical evidence of a serious medical need.  *See Boring v. Kozakiewicz*, 833 F.2d 468, 473-74 (3d Cir. 1987); *see also Hakeen v. Salaam*, 260 F. App'x 432, 434 (3d Cir. 2008) (concluding that summary judgment was proper because plaintiff failed to offer any expert evidence about his serious medical need); *Anderson v. Folino*, No. 10-937, 2013 U.S. Dist. LEXIS 23193, at *27-28 (W.D. Pa. Jan 23, 2013) (granting summary judgment where the plaintiff failed to submit any expert medical testimony or evidence of a serious medical need).

Plaintiff has failed to show that his injuries constitute a serious medical need under *Estelle*.[14]  Summary judgment will therefore be granted on his denial of medical care claim under the Fourteenth Amendment.

### D.    Deprivation of Property Claim against Officers Boorstein and Bonham, and Sergeant Herncane

Plaintiff also asserts a claim for deprivation of property, in violation of the Due Process Clause of the Fourteenth Amendment based on his allegation that the officers stole $350 from his wallet.  Defendants seek to dismiss the claim against Officers Boorstein and Bonham, and Sergeant Herncane, arguing that Plaintiff fails to allege facts showing that these officers were involved with the alleged theft.  Defendants do not seek dismissal of this claim against Officer Ocetnik.

Plaintiff maintains that all of the police officers are liable for this due process violation,

---

[14] Because Plaintiff has failed to prove the first element of the *Estelle* standard, we need not address the second element—whether Defendants acted with deliberate indifference. Similarly, we need not address Defendants' additional arguments that Officers Bonham and Ocetnik did not specifically deny Plaintiff medical services, or that the police officers are entitled to qualified immunity on this claim.

not just Officer Ocetnik.  However, Plaintiff overlooks his Amended Complaint, which explicitly states that "Defendant Ocetnik then took Plaintiff's wallet and removed $350.00 from it," and "then threw Plaintiff's wallet, without the money, back into Plaintiff's truck."  (Am. Compl. ¶¶ 37-38.)  The Amended Complaint does not allege that Officers Boorstein and Bonham, and Sergeant Herncane had any part in the alleged theft.  Plaintiff's deposition testimony supports his accusation against only Officer Ocetnik.  (*See* Stroud Dep. 114-15).  Specifically, Plaintiff described how Officer Ocetnik removed Plaintiff's wallet from Plaintiff's back pocket, how Officer Ocetnik "snatched" $350 from the wallet and put it into his pocket, and how Officer Ocetnik threw the wallet back into Plaintiff's truck.  (*Id*.)  Plaintiff has failed to create a genuine issue of material fact with regard to the other police officers' involvement in the alleged theft.  Plaintiff's deprivation of property claim against Officer Boorstein and Sergeant Herncane will be dismissed.

### E.    Excessive Force and Assault and Battery Claim against Officer Bonham and Sergeant Herncane

Finally, Plaintiff asserts a section 1983 claim for excessive force and state law claims of assault and battery against all of the police officers.[15]  Defendants seek to dismiss the claims against Officer Bonham and Sergeant Herncane.  Defendants concede that there are disputed issues of fact with respect to the claims against Officers Boorstein and Ocetnik and do not seek dismissal of the claims against these officers.

To make out a claim for excessive force under the Fourth Amendment, Plaintiff must show that a seizure occurred and that the seizure was unreasonable.  *Abraham v. Raso*, 183 F.3d

---

[15] Plaintiff also asserts a claim for unlawful seizure.  However, the unlawful seizure claim and the excessive force claim are essentially the same claim.  A police officer's use of excessive force in the course of an arrest or investigatory stop is considered an unlawful "seizure" under the Fourth Amendment.  *Carswell v. Borough. of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004).

279, 288 (3d Cir. 1999); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) (stating that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard") (emphasis in original).  The parties do not dispute that a seizure occurred here.  Therefore, the issue before the Court is whether the force used by Officer Bonham and Sergeant Herncane to effect the seizure was objectively reasonable.

The reasonableness standard under the Fourth Amendment looks at whether, under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation."  *Graham*, 490 U.S. at 397.  This "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. at 396 (internal quotation marks omitted).  "The relevant inquiry is 'the reasonableness of the officer's belief as to the appropriate level of force,' which 'should be judged from the officer's on-scene perspective,' and not in the '20/20 vision of hindsight.'"  *Curley v. Klem*, 499 F.3d 199, 206-207 (3d Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  In considering the reasonableness of the police officers' actions, courts should pay "'careful attention to the facts and circumstance of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest, or attempting to evade arrest by flight.'"  *Id*. at 207 (quoting *Graham*, 490 U.S. at 396).  The question of reasonableness should typically be left for the jury; however, "'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.'"

*Abraham*, 183 F.3d at 290 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Under Pennsylvania law, an assault is "'an intentional attempt by force to do injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.'" *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quoting *Cohen v. Lit Bros.*, 70 A.2d 419, 421 (Pa. Super. Ct. 1950)). "A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty." *Id*. A police officer will become liable for assault and battery when the "force used in making an arrest is unnecessary or excessive." *Id*. Thus, similar to excessive force, the analysis of assault and battery requires consideration of the reasonableness of the police officers' actions in the context of the arrest.

### 1.    Sergeant Herncane

Defendants argue that that summary judgment is appropriate for Sergeant Herncane because he arrived to the scene after the incident occurred and because there is no evidence that he used any force against Plaintiff. We agree. According to Plaintiff's testimony, Sergeant Herncane approached the scene as Plaintiff was being placed in the police vehicle. (Stroud Dep. 103.) Plaintiff states that he attempted to tell Sergeant Herncane his version of the incident, but that the Sergeant "used his hip" and "slammed the door [of the police car] on [Plaintiff]." (*Id*.) Plaintiff alleges no other facts involving Sergeant Herncane in the stop and arrest. Based on these undisputed facts, we are satisfied that Plaintiff has failed to establish claims for excessive force, or assault and battery against Sergeant Herncane. Accordingly, summary judgment is appropriate with respect to these claims.

### 2.    Officer Bonham

Defendants also contend that Officer Bonham is entitled to summary judgment on

Plaintiff's claims for excessive force and assault and battery.  Specifically, Defendants argue that Officer Bonham's involvement in the arrest of Plaintiff was limited in that he "merely sought to subdue Plaintiff by restraining him with 2 palm strikes to Plaintiff's upper right shoulder, and relied upon the actions of Officers Boorstein and Ocetnik in seeking to solely subdue Plaintiff." (Def.'s Mot. 15.)  Plaintiff's version of the events is somewhat different.  Plaintiff states that when he was on the ground paralyzed, Officer Bonham approached Plaintiff while Officer Boorstein was punching him and Officer Ocetnik was kicking him.  (Stroud Dep. 95-96.)  Plaintiff states that Officer Bonham "hit [Plaintiff] in the shoulder," and then told the other officers to "Taser him again," at which time Plaintiff was Tasered on his left butt cheek.  (*Id*. at 96.)

The differing factual accounts present a disputed issue of material fact that directly relates to the reasonableness of Officer Bonham's use of force during the arrest.  Viewing the facts in a light most favorable to Plaintiff, a jury could find that Officer Bonham's shoulder strike and subsequent call for the use of the Taser gun while Plaintiff was already on the ground paralyzed was unreasonable under the circumstances, particularly in light of the severity of the crime—a traffic stop for summary traffic violations—and the fact that Plaintiff could not have been resisting arrest if he was paralyzed from the first use of the Taser gun.  We are satisfied that these disputed issues of fact preclude summary judgment with regard to Plaintiff's claims of excessive force, assault, and battery against Officer Bonham.

### 3.    *Qualified Immunity – Officer Bonham*

Finally, Officer Bonham argues that he is protected by qualified immunity on the excessive force claim.  Government officials, such as police officers, are extended qualified immunity in actions brought under section 1983 "'insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).   "'Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'"   *Id*. at 1245 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

Defendants argue that qualified immunity shields Officer Bonham from liability because he reasonably relied on the lead of the other police officers during the arrest of Plaintiff. Defendants rely on the case, *Rodriguez v. Wolback*, 499 F. Supp. 2d 479 (S.D.N.Y. 2007), in support of their argument.  In *Rodriguez*, the court determined that a police officer was immune from liability for a false arrest claim where the officer reasonably relied on the probable cause determination of another police officer to effectuate an arrest.  *Id*. at 488, 493.  *Rodriguez* does not apply to the issue presented here because it addresses qualified immunity in the context of a false arrest claim.  Here, Officer Bonham seeks qualified immunity for the excessive force claim, which is based on a reasonableness standard and not on a probable cause analysis.  In addition, Defendants have presented no evidence suggesting that Officer Bonham reasonably relied on the lead of Officers Boostein and Ocetnik.  Viewing the facts from Plaintiff's perspective, Officer Bonham arrived to the scene of the altercation, struck a paralyzed Plaintiff in the shoulder, and ordered the use of the Taser gun on him, all without any communication with the other police officers.  We are not persuaded by Officer Bonham's argument.  Qualified immunity does not apply to Plaintiff's excessive force claim against Officer Bonham.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment will be granted in part, and denied in part.  Summary judgment will be entered in favor of all Defendants on all of Plaintiff's claims except for:  the excessive force claim against Officers Boorstein, Ocetnik, and Bonham (Count 1); the assault and battery claims against Officers Boorstein, Ocetnik, and Bonham (Count 3); and the deprivation of property claim against Officer Ocetnik (Count 2).

An appropriate Order will follow.


**BY THE COURT:**


_____

**R. BARCLAY SURRICK,   J.**

23